The Honorable James L. Robart

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR16-287 JLR |
| Plaintiff, | UNITED STATES' TRIAL BRIEF |
| v. | |
| BALTAZAR REYES GARCIA,<br>HECTOR CONTRERAS IBARRA,<br>ANGEL SERRANO CARRENO, | |
| Defendants. | |

The United States, by and through Annette L. Hayes, United States Attorney for the Western District of Washington, and Steven T. Masada and S. Kate Vaughan, Assistant United States Attorneys for said District, respectfully submits this trial brief. Trial is set to commence September 28, 2017.

## I.    INTRODUCTION – THE CHARGES.

This case originally charged 17 defendants.  As of this date, only three of these Defendants, Baltazar Reyes Garcia, Hector Contreras Ibarra, and Angel Serrano Carreno remain set for trial, with all other defendants having pled guilty.

U.S. Trial Brief - 1
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The charges in this case fall into three categories.  First, all three defendants are charged jointly in Count 1, which alleges a *Conspiracy to Distribute Controlled Substances* (cocaine, methamphetamine and heroin).  All three defendants are alleged to have agreed with others to distribute these controlled substances in an amount foreseeably exceeding the 841(b)(1)(A) threshold amounts.

The second category of charges, Counts 5, 6, and 9, are based on the covert investigation conducted by law enforcement.  All allege *Distribution of a Controlled Substance*.  Each of these counts is charged as a violation of 21 U.S.C. § 841(a)(1), 841(b)(1)(A) and Title 18, United States Code, Section 2, given the drug quantities involved.

The third category of charges relate to items seized during arrests and various search warrants.  Specifically, Defendant Serrano is charged with substantive counts related to items recovered during the search of his respective residences.  Defendant Serrano is charged in two counts arising from the search of his residence at 15072 Nookachamps Road, Mount Vernon on November 2, 2016.  He is charged in Count 35 with *Possession with Intent to Distribute* heroin, and in Count 36 with Unlawful Possession of Ammunition by a Prohibited Person (felon).   Defendant Serrano is also charged in Count 41 with *Possession with Intent to Distribute* heroin arising from the search of his post-release residence at 807 S 27th Street, Mount Vernon, Washington on November 22, 2016.  Both of the drug counts stemming from residential searches are charged at the 841(b)(1)(C) level.

The government tentatively estimates that its case-in-chief will last approximately ten trial days, depending of course on the length and scope of cross-examination, on length and nature of the defenses' case and need for rebuttal, and on how much the use of translators slow the proceedings.  The United States tentatively anticipates calling approximately 35 witnesses and introducing approximately 450 exhibits (the majority of which are photographs, videos, and recordings, which may be admitted in bulk).

U.S. Trial Brief - 2
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

AUSA S. Kate Vaughan will conduct *voir dire* and will give the closing argument. AUSA Steven T. Masada will give the opening statement and rebuttal argument.

## II.    FACTUAL SUMMARY

The Court is by now familiar with the background of this case from prior hearings and the various pretrial motions.  Defendants Baltazar Reyes Garcia and Hector Contreras Ibarra were partners who supplied the Eric Marquez and Hector Hugo Garcia Gutierrez's distribution operation with narcotics.  Defendant Serrano was a drug redistributor who, with others, obtained the drugs from Reyes Garcia and Hector Contreras Ibarra.  Defendant Serrano also maintained a stash house where the drugs obtained from Baltazar Reyes Garcia and Hector Contreras Ibarra were stored and processed.  The government anticipates the evidence will show the following.

**A.    Controlled Buys and Surveillance**

In late 2015, a Federal Bureau of Investigation (FBI) Task Force was investigating the drug trafficking activities of a multi-pound trafficker, Alfredo Jurado Sanchez, and his associates.  Sanchez was a known associate of, and, based on toll data, in frequent contact with, defendant Baltazar Reyes-Garcia, an individual known to local law enforcement for suspected ties to narcotics activity.

On September 18, 2015, authorities conducted a traffic stop on a Jeep Cherokee driven by Sanchez based on information that he was transporting drugs.  Investigators discovered approximately six pounds of methamphetamine concealed in a hidden compartment in the Jeep.[1]  The drugs were analyzed and found to contain fingerprints of co-defendant Hector Hugo Garcia Gutierrez.  According to pen register and toll data on Sanchez's phone, in the days leading up to the seizure, between September 3 and September 11, 2015, there were 24 calls and texts between Sanchez and Target Telephone (TT1), subscribed to Reyes-Garcia.

---

[1] Sanchez was arrested, charged and ultimately sentenced on federal drug charges.

U.S. Trial Brief - 3
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    In December 2015, the FBI Task Force learned of a parallel investigation targeting

2    similar suspects, namely, Reyes-Garcia, and his associates, Hector Contreras Ibarra and

3    his father, Jorge Contreras.  Investigators acquired significant information and were able

4    to conduct three controlled purchases of methamphetamine through an individual

5    cooperating with authorities (CS3).  Each transaction involved 1580 E. Selah Road,

6    Yakima, Washington ("Yakima Residence"), the residence of Jorge Contreras.

7    On December 4, 2015, CS3, after meeting with investigators and following the

8    standard protocols, drove to the Yakima Residence under surveillance and purchased

9    about 27.9 gross grams (gg) of methamphetamine.  According to statements made by

10   CS3 just after the transaction, he/she acquired the drugs from Contreras Ibarra in

11   exchange for the prerecorded buy money.

12   In mid-December 2015, CS3 provided investigators with a description and license

13   plate of a vehicle CS3 believed belonged to Contreras Ibarra's drug source, a Mercedes

14   with Washington plate AVT1244 ("Reyes-Garcia Mercedes"), at the Yakima Residence.

15   According to the Washington Department of Licensing (DOL), that Mercedes was

16   registered to Baltazar Reyes-Garcia.  CS3 was shown Reyes-Garcia's DOL photograph

17   (with descriptors removed) and identified Reyes-Garcia as the source driving the Reyes-

18   Garcia Mercedes.  Surveillance later observed Reyes-Garcia driving this vehicle as well.

19   On January 7, 2016, CS3 conducted a second controlled purchase of

20   methamphetamine, this time from Jorge Contreras.  After the details were arranged by

21   telephone, surveillance observed a vehicle depart the Yakima Residence and drive to the

22   meet location, where CS3 entered the vehicle and conducted the transaction.  Thereafter,

23   the vehicle returned to the Yakima Residence.  CS3 met with investigators, provided the

24   purchased 26.2 gg of meth, and confirmed the transaction was with Jorge Contreras.

25   On January 14, 2016, CS3 conducted a third controlled purchase of

26   methamphetamine, again from Jorge Contreras.  As before, after the deal was set,

27   surveillance observed a vehicle depart the Yakima Residence and drive to the

28

U.S. Trial Brief - 4
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

prearranged meet location.  After conducting the transaction with CS3, the vehicle later returned to the Yakima Residence.

The government expects a confidential source (CS3) to testify regarding additional information about Reyes-Garcia and the Contrerases.  CS3 used to transport drugs and money for Contreras Ibarra and Jorge Contreras and otherwise assisted in their criminal activity and knew Reyes-Garcia, whom he knew as "Balta," was the "boss."  CS3 observed pound quantities of drugs that were stored at the Yakima Residence, and knew that Reyes-Garcia used vehicles with hidden compartments to transport drugs and money.  CS3 drove with Contreras Ibarra from Yakima to Seattle to deliver drugs and money to Reyes Garcia, who lived in a residence north of Seattle near Tulalip Casino.  CS3 further assisted Contreras Ibarra process pound quantities of methamphetamine at the Yakima Residence.

In February 2016, based on information gained from the investigations, FBI obtained a tracking warrant for Reyes-Garcia's phone, TT1.  GPS location data for TT1 indicated that Reyes-Garcia was residing in Camano Island, within the Western District of Washington, but also making various trips elsewhere, to include back and forth to Eastern Washington.

For instance, on March 2, 2016, GPS location data showed TT1 traveling east on Interstate 90.  Later that afternoon, investigators observed the Reyes-Garcia Mercedes parked at the Yakima Residence.  Physical surveillance later observed Reyes-Garcia and Contreras Ibarra depart a hotel in Yakima in the Reyes-Garcia Mercedes.  According to hotel records, Hector Contreras Ibarra had rented a room for two adults and listed a residential address of 1462 E. S. Camino Dr., Camino Island, WA.[2]  Per TT1 location data, Reyes-Garcia and Contreras Ibarra returned to Camano Island that same evening.

In April 2016, Garcia Gutierrez, Reyes-Garcia, and Contreras Ibarra were

---

[2] Investigators later confirmed that Reyes-Garcia and Contreras Ibarra in fact resided at 1462 SE Camano Drive, Camano Island, Washington.

U.S. Trial Brief - 5
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

1   identified in an ongoing joint investigation conducted by FBI and the Drug Enforcement

2   Administration (DEA) in Western Washington.  On May 11, 2016, investigators obtained

3   court authorization to continue tracking the Reyes-Garcia Mercedes.

4           In March 2016, through a cooperating source (CS1), investigators had identified

5   co-defendant Eric Marquez as a drug distributor residing in and around Skagit County,

6   Washington.  Beginning in early April 2016, through CS1, investigators conducted

7   multiple controlled purchases of various drugs from Marquez and quickly identified his

8   drug partner and roommate as Garcia Gutierrez and their primary drug source at the time

9   as Reyes-Garcia and Contreras Ibarra.  Investigators later introduced an undercover law

10  enforcement officer (UC1) to Marquez and Garcia Gutierrez who further infiltrated the

11  distribution network.

12          On April 5, 2016, CS1 met with Marquez in order to arrange the purchase of

13  heroin.  Marquez told CS1 that he would have the heroin in a couple days and instructed

14  CS1 to contact him then.  Two days later, on April 7, 2016, investigators met with CS1

15  and instructed CS1 to contact Marquez.  Marquez agreed to meet CS1 at the Splash and

16  Dash carwash and during their meeting sold CS1 approximately one ounce of heroin.

17  After the meeting with CS1, investigators continued to follow Marquez who was driving

18  a Subaru Impreza.  After briefly stopping at a residence in Mount Vernon, Marquez drove

19  to an AutoZone, where he met with co-defendants Angel Serrano Carreno, Hector Hugo

20  Garcia Gutierrez and Leopoldo Savalza Vela.  Investigators observed all four individuals

21  walk into AutoZone and then return to the parking lot approximately ten minutes later.

22  Marquez and Savalza Vela got into the Subaru Impreza, Garcia Gutierrez got into a

23  Chevy Monte Carlo, and Serrano got onto a red motorcycle.  Investigators followed all

24  three vehicles as they drove in tandem a residence on Nookachamps Road.  At the

25  residence, Garcia Gutierrez parked the Chevy Monte Carlo and got into the Subaru

26  Impreza with Marquez and Savalza Vela.  The Subaru then drove, still in tandem with the

27  red motorcycle driven by Serrano, to Marquez's and Garcia Gutierrez's shared residence

28  U.S. Trial Brief - 6
    *U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

1  located at 20341 Stackpole Road, Mount Vernon, Washington (hereinafter "Stackpole

2  Residence").

3         On April 14, 2016, CS1 met with Marquez at the splash and dash carwash to

4  discuss the purchase of methamphetamine.  Marquez quoted a price of $5,000 per pound,

5  and told CS1 that he sourced methamphetamine through his roommate (Garcia

6  Gutierrez).  On April 19, 2016, CS1 conducted a controlled purchase of over a pound of

7  methamphetamine, which, the evidence shows, was supplied by Reyes-Garcia and

8  Contreras Ibarra.  More specifically, Eric Marquez met CS1 at a carwash in Mount

9  Vernon, Washington in anticipation of a one-pound methamphetamine deal.  Driving

10  Marquez's truck, Garcia Gutierrez, Serrano and Savalza Vela then brought Marquez and

11  CS1 a sample amount (about 31.2 gross grams (gg)) from a nearby motel.  After CS1

12  departed and later indicated the sample was acceptable, Marquez, Garcia Gutierrez,

13  Serrano and Savalza Vela met with their drug source, Reyes-Garcia and Contreras Ibarra,

14  in a restaurant parking lot.  The entire group then drove to Reyes-Garcia's and Contreras

15  Ibarra's residence, 1462 SE Camano Drive, Camano Island, Washington ("Camano

16  Residence"), where they acquired the pound of methamphetamine.  Marquez, Garcia

17  Gutierrez, Serrano, and Savalza Vela then returned to the same carwash, where Marquez

18  delivered the methamphetamine (about 498 gg) to CS1 in exchange for $5,000.  This

19  conduct in charged in Count 5 with respect to all three Defendants.

20         On May 11, 2016, GPS location data for Reyes-Garcia's phone, TT4, revealed that

21  Reyes Garcia was located in the area of 15072 Nookachamps Road.  Investigators

22  responded to the area in order to conduct surveillance on Reyes Garcia.  By the time

23  investigators arrived in Mount Vernon, GPS location data for TT4 showed that Reyes

24  Garcia's phone was located at Taqueria La Bamba, 2222 Riverside Drive, Mount Vernon,

25  Washington.  Investigators established surveillance and observed Reyes Garcia,

26  Contreras Ibarra, Marquez, Garcia Gutierrez, and Savalza Vela walk out of Taqueria La

27  Bamba.  The individuals talked for a couple of minutes and then Marquez, Garcia

28      U.S. Trial Brief - 7

    *U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Gutierrez, and Savalza Vela got into a gray BMW and drove away from the area.
2  Investigators observed Contreras Ibarra and Reyes Garcia get into a Cadillac CTS and
3  drive away from the area.  Investigators followed Reyes Garcia and Contreras Ibarra as
4  they drove directly to the Camano Residence, where they were greeted by an unknown
5  Hispanic male who was standing in the driveway.  Investigators observed Reyes Garcia
6  load two travel bags and a cardboard box into the trunk of a Chrysler 300, which was
7  parked behind a tree in the driveway.  At approximately 3:52 p.m., investigators observed
8  the Chrysler 300 depart the residence.  GPS location data for Reyes Garcia's phone, TT4,
9  indicated that Reyes Garcia was traveling in the Chrysler 300.  GPS location data for
10 Reyes Garcia's phone, TT4, on May 12 and May 13, 2016, indicated that Reyes Garcia
11 had traveled to California.  Notably, Reyes-Garcia subsequently met with Marquez on
12 May 21, 2016, at the Stackpole Residence, to collect money presumably for an additional
13 drug shipment.

14      On May 23, 2016, CS1 purchased a further pound of methamphetamine from the
15 Marquez DTO, in a deal involving the Nookachamps Residence.  Agents were
16 conducting surveillance on Marquez and observed him leave his Stackpole residence and
17 drive together with Savalza Vela in the Subaru Impreza to the Nookachamps Residence.
18 They parked under the carport of the Nookachamps Residence for approximately a
19 minute, and then left and returned to Marquez's Stackpole residence.  Marquez and
20 Savalza Vela remained there for a short period and then returned again in the Subaru
21 Impreza to Nookchamps Road.  On their way there, Marquez called CS1 and asked if he
22 had the "papers", a known code for money.  CS1 confirmed, and Marquez and CS1
23 agreed on a location for the drug deal.  Marquez and Savalza Vela then parked in the
24 driveway of the 15082 Nookachamps Road, the house adjacent to the Nookachamps
25 Residence (trailer) and met with Contreras Ibarra, who had been observed leaving his
26 Camano Island Residence earlier that afternoon.  Marquez obtained the
27 methamphetamine from the trunk of Contreras Ibarra's Jeep Liberty, and then left in the

28

Subaru Impreza with Savalza Vela.  Marquez and Savalza Vela drove directly to meet with CS1 where they delivered approximately a pound of methamphetamine (about 662 gg) in exchange for $2,500.  On June 8, 2016, CS1 paid Marquez another $2,500 payment for this methamphetamine delivery.  This conduct is charged in Count 6 with respect to Defendants Reyes Garcia and Contreras Ibarra.

On June 22, 2016, Serrano was observed conducting a drug transaction. Investigators were conducting surveillance on DTO members when they observed Serrano driving a black Lexus sedan.  Investigators followed Serrano and immediately became suspicious as Serrano began driving in circular patterns throughout Mount Vernon, Washington.  On multiple occasions investigators nearly lost surveillance on Serrano as he drove from one end of Mount Vernon to the other, making nonsensical turns through neighborhoods and commercial areas.  Ultimately, Serrano returned to the same neighborhood where investigators originally started following him and pulled into an apartment complex.  There investigators watched as the driver of a Suzuki Areo, later identified as Jimenez Soto, got into Serrano's Lexus.  Moments later Jimenez Soto got out of Serrano's Lexus, returned to the Suzuki Aero, and drove away from the area.

Investigators followed Jimenez Soto to Skagit Valley Mobile Manor, 1400 N. 30th Street, Trailer #70, Mount Vernon, Washington.  There, investigators arranged for a Mount Vernon Police Officer to make contact with Jimenez Soto and his passenger, identified as Espinoza, while they were parked in the driveway of Trailer #70.  The Mount Vernon Police Officer later searched the Suzuki Areo and located a bag containing two balls of methamphetamine (about 25 grams), as confirmed by lab testing. Based on the circumstances, investigators believed that the meeting between Serrano and Jimenez Soto related to the delivery of drugs.

On June 28, 2016, Garcia Gutierrez, Reyes Garcia, and Contreras Ibarra participated in another sizeable delivery of methamphetamine to UC1.  More specifically, Garcia Gutierrez and Marquez met with UC1 in a parked car in Mount Vernon in

U.S. Trial Brief - 9
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   anticipation of a one-pound delivery.  During that meeting, which was recorded, they

2   informed UC1 that another co-defendant (Savalza Vela) had taken the remaining meth on

3   hand, but they had more arriving shortly from Yakima.  In UC1's presence, Garcia

4   Gutierrez called a source who confirmed that the meth was en route from Yakima.  UC1

5   agreed to meet later when the drugs arrived.

6       Thereafter, Marquez, Garcia Gutierrez and another co-defendant met Reyes-

7   Garcia before traveling to a restaurant in Stanwood where they met the load vehicle,

8   driven by Contreras Ibarra's wife.  Reyes-Garcia removed a package (drugs) from the

9   load vehicle and placed it in the trunk of Garcia Gutierrez's car.  Garcia Gutierrez and the

10  others then drove to the Nookachamps Residence, which was used to stash and process

11  drugs, where he brings a package from the trunk into the trailer.  Shortly thereafter,

12  Garcia Gutierrez and two other co-defendants departed and delivered the pound of meth

13  to UC1 at a prearranged meet location.  Investigators later reviewed video footage from a

14  pole cam installed at the Yakima Residence, Reyes-Garcia and Contreras Ibarra's stash

15  location (and the same location involved in CS3's controlled buys and prior surveillance).

16  Earlier that same day, the aforementioned load vehicle arrived and was loaded with

17  numerous items before departing and meeting with Reyes-Garcia and Garcia Gutierrez in

18  Stanwood. This conduct is charged in Count 9 with respect to Defendants Reyes Garcia

19  and Contreras Ibarra.

20      On July 8, 2016, Marquez and UC1 met at a restaurant and discussed the prospect

21  of UC1 smuggling drugs into Canada.  During that recorded meeting, Marquez stated,

22  among other things, that his associates already transported drugs to Washington from

23  Mexico ("down there") and smuggled proceeds back into the United States from Canada.

24  Marquez discussed UC1 possibly smuggling a small test load for the operation.

25  Immediately after the meeting with UC1, Marquez met with Reyes-Garcia at a nearby gas

26  station.

27      During the course of this investigation, Reyes-Garcia and Contreras Ibarra moved

28

out of the Camano Residence and thereafter changed their behavior after becoming wary of law enforcement's investigation.  In mid-July 2016, surveillance units were following Reyes-Garcia and two associates.  Their vehicle engaged in several evasive maneuvers and, while surveillance was momentarily lost, Reyes-Garcia apparently fled from the vehicle on foot.  A cooperating witness later told investigators of a recent incident where Reyes-Garcia believed DEA was following him and escaped by hiding in a bush.

**B.     The Wiretap Investigation**

Investigators sought and obtained Title III wiretap authorizations for various phones, which substantially advanced the investigation and assisted in identifying and ultimately arresting numerous previously unidentified members of the trafficking organization.  The government will offer some evidence related to the ongoing drug trafficking conspiracy.

The wiretaps also confirmed that Reyes-Garcia and Contreras Ibarra continued to supply drugs to the co-conspirators.  For instance, in October 2016, investigators intercepted calls of Garcia Gutierrez and Marquez discussing that a co-defendant was the subject of threats by an individual referred to as "Balta" and "El Ena" (Reyes-Garcia[3]) over an outstanding drug debt.   In a call on October 3, 2016, Garcia Gutierrez told Marquez that "El Ena" had called him with "real threats" and was looking for this particular co-defendant in order to "cause a little pain, so they get it together." Subsequent intercepted communications confirmed that this co-defendant was aware that people were looking for him and trying to avoid them.  When that co-defendant was later arrested, he told investigators, among other things, that he owed Reyes-Garcia about $15,000 for fronted cocaine that had been stolen.  The co-defendant further stated that, approximately a month prior, "Hector" (Contreras Ibarra) and a man he believed to be

---

[3] Reyes-Garcia is referred to as "Enano" and similar nicknames.

U.S. Trial Brief - 11
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

1   Reyes-Garcia's brother came to his residence and threatened to "torture" him over the

2   debt.   The co-defendant said he paid Contreras Ibarra some money but had not yet fully

3   paid Reyes-Garcia.  Further, on October 13, 2016. Reyes Garcia called and texted Garcia

4   Gutierrez asking for Garcia Gutierrez to call him.

5   **C.**     **Residential Searches**

6         On November 2, 2016, investigators conducted multiple arrests and searches of

7   numerous locations and vehicles in the Western and Eastern Districts of Washington as

8   part of a coordinated takedown operation.  In total, they seized multiple additional

9   kilograms of drugs, numerous firearms, ammunition, cash, digital scales, vacuum sealers

10   and other evidence of drug trafficking.  That morning, agents located Reyes-Garcia,

11   Contreras Ibarra, and Jorge Contreras together at an apartment complex in Las Vegas,

12   Nevada.  Serrano was arrested at the Nookachamps Residence, discussed below.

13         During the search of the Yakima Residence (1580 E Selah Road, Yakima,

14   Washington), agents discovered an area used for processing and packaging marijuana for

15   distribution, to include drying racks, fans, vacuum seal bags, and a large quantity of

16   illegal marijuana in various stages of processing.  Also recovered were five firearms,

17   specifically, two semiautomatic handguns, one revolver, and two rifles, along with

18   multiple boxes of various caliber ammunition.  Agents further seized items of dominion

19   and control, including documentation belonging to Contreras Ibarra and his father, Jorge

20   Contreras.

21         At Contreras Ibarra's residence (6108 Westminster Lane, Pasco, Washington),

22   agents encountered and briefly questioned Contreras Ibarra's wife.  Among other things,

23   they located and seized documentation related to the Yakima Residence and two

24   firearms, specifically, a Springfield XD 9mm semiautomatic pistol and a Browning Arms

25   9mm semiautomatic pistol, which was loaded.  One gun had been reported stolen.

26         As noted above, Serrano was present at the Nookachamps Residence and was

27   arrested.  During the search, investigators located and seized approximately 107 gross

28

U.S. Trial Brief - 12
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

grams of heroin, two digital scales, drug packaging, a vacuum sealer, two blenders, multiple cell phones, and over $3,500 of United States currency.  Investigators also seized two assault rifle magazines containing 13 rounds of Wolf 7.62x39mm ammunition and 2 rounds of Tula 7.62x39mm ammunition, respectively.  This conduct is charged as Count 35 and 36.

During a post-*Miranda* interview on November 2, 2016, Serrano admitted to picking up drugs from Marquez and Garcia Gutierrez but claimed that he had not done so for several months ago and that he was no longer selling drugs because it was not paying out like it did before.

Defendant Serrano was taken into custody and was arraigned on the Indictment on November 3, 2016.  The Court ordered Defendant released pending trial on bond conditions.  He was released to reside at 807 S. 27th Street Mount Vernon, Washington.

On November 18, 2016, Mount Vernon Police Officers were on routine patrol in Mount Vernon, Washington.  At approximately 11:00 a.m., officers observed an unknown male walk out of the front door of 807 S. 27th Street, Mount Vernon, Washington (Serrano's residence), and depart in a vehicle for which there was an active warrant.  Officers followed the individual and conducted a traffic stop.  During the traffic stop, officers located a Beretta .22 handgun, a baggie containing 4.5 grams of suspected heroin, two rifle rounds, a scale, mushrooms, and two cell phones.

On November 22, 2016, agents executed a search warrant at Serrano's 807 S. 27th Street residence.  The only individuals present in the house were Serrano and co-defendant Rigoberto Castellano Herrera, who similarly had been arrested but released on pretrial bond.  Agents located approximately one ounce of heroin, as confirmed by lab testing, packaging materials, and a digital scale in the residence.  Agents also located five cellphones.  This conduct is charged as Count 41.

During a post-*Miranda* statement on November 22, 2016, Serrano admitted knowing the individual who had come to his house on November 18, 2016, and stated

U.S. Trial Brief - 13
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

that he used to sell heroin to him in the summer.  Serrano also said that he used to have connections but that he (Serrano) stopped selling drugs months ago.

### III.    THE OFFENSES.

As set forth above, all three Defendants are charged with *Conspiracy to Distribute Controlled Substances* as well as with various substantive drug distribution and drug possession offenses, which are alleged to be in furtherance of Count 1.  Defendant Serrano is also charged with felon in possession of ammunition.

### A.    Conspiracy to Distribute Controlled Substances.

To convict the Defendants of Count 1, the government must prove that: (1) there was an agreement between two or more persons to manufacture or distribute controlled substances; and (2) the defendants joined in the agreement knowing of its purpose and intending to help accomplish that purpose.  *See* Ninth Circuit Model Jury Instruction § 9.19 (2010 Edition – approved 9/2015); *United States v. Penagos*, 823 F.2d 346, 348 (9th Cir. 1987), *modified by United States v. Shabani*, 513 U.S. 10 (1994).  One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy.  *See* Ninth Circuit Model Jury Instruction § 9.19.  Proof of an overt act is not required for a conviction under the drug conspiracy statute in 21 U.S.C. § 846.  *Shabani*, 513 U.S. at 14-15 ("In order to establish a violation of [the drug conspiracy statute], the Government need not prove the commission of any overt acts in furtherance of the conspiracy.").

#### 1.    Agreement and Knowledge.

The agreement to accomplish an illegal object need not be a formal agreement.  It is sufficient to show that the conspirators came to a mutual understanding to accomplish an unlawful purpose.  *American Tobacco Co. v. United States*, 328 U.S. 781, 809 10 (1946); *United States v. Kiriki*, 756 F.2d 1449, 1453 55 (9th Cir. 1985).  Indeed, the agreement "may

U.S. Trial Brief - 14
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

consist of nothing more than a tacit understanding." *United States v. Mohr*, 728 F.2d 1132, 1135 (8th Cir. 1984).

An agreement constituting a conspiracy may be inferred from the acts of the parties, *see United States v. Fulbright*, 105 F.3d 443, 448 (9th Cir. 1997), such as through evidence of coordinated activity between the defendant and alleged co-conspirators. *United States v. Hegwood*, 977 F.2d 492, 497 (9th Cir.1992), cert. denied, 508 U.S. 913(1993); *accord United States v. Hernandez*, 876 F.2d 774, 778 (9th Cir. 1989). Thus, one means of proving a conspiracy is by showing that defendants acted together to achieve a common goal. *United States v. Mesa-Farias*, 53 F.3d 258, 260 (9th Cir. 1995). It is not necessary to show that each co-conspirator was aware of all of the details of the conspiracy or of the parties involved. When one joins an illegal venture, one becomes part of the scheme although he or she may know only of his or her own share of wrongdoing. *Blumenthal v. United States*, 332 U.S. 539, 556-57 (1947); *Chavez v. United States*, 275 F.2d 813, 817 (9th Cir. 1960). Indeed, "once a conspiracy exists, evidence establishing beyond a reasonable doubt a defendant's connection with the conspiracy, even though the connection is slight, is sufficient to convict the defendant of knowing participation in the conspiracy." *United States v. Delgado*, 357 F.3d 1061, 1066 (9th Cir. 2004).

The government need not prove that a conspirator knew the identity, location, number, and function of all his or her co-conspirators, or that all worked together consciously to achieve a desired end. *United States v. Kearney*, 560 F.2d 1358, 1362 (9th Cir. 1977), *cert. denied*, 434 F.2d 971 (1977). The hallmark of a conspiracy is concerted activity. "The federal courts uniformly hold ... that government agents ... may testify as to the general practices of criminals to establish the defendant's modus operandi" in conspiracy cases. *See United States v. Johnson*, 735 F.2d 1200, 1202 (9th Cir. 1984); *United States v. Patterson*, 819 F.2d 1495, 1507 (9th Cir. 1977); *United States v. Andersson*, 813 F.2d 1450, 1458 (9th Cir. 1987) (testimony regarding trafficking methods and counter-surveillance).

U.S. Trial Brief - 15
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### 2.    Criminal Liability of Co-Conspirators.

Each member of the conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy. *See Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946). Stated another way, if one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime. Thus, one who joins an ongoing conspiracy is bound by all of the prior acts of co-conspirators taken in furtherance of the conspiracy. *See* Ninth Circuit Model Jury Instruction § 8.25 (2010 Edition); *see also United States v. Traylor*, 656 F.2d 1326, 1337 (9th Cir. 1981). Similarly, a co-conspirator is also responsible for all reasonably foreseeable crimes committed in furtherance of the conspiracy, even if he or she did not participate in or have knowledge of their commission. *Pinkerton*, 328 U.S. at 647-48; *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1202 (9th Cir. 2000). Accordingly, Defendant is accountable for all foreseeable crimes committed by his co-conspirators in furtherance of the conspiracy charged in Count 1.

### 3.    Evidence of Conspiratorial Conduct.

A conspiracy may be proven from circumstantial evidence and may exist without the existence of a formal agreement. Indeed, conspiracy can rarely be proved by direct evidence in light of the clandestine nature of the offense and the resultant difficulty of direct proof. The elements may therefore be established by evidence of coordinated activities between the defendants. *United States v. Ortega*, 203 F.3d 675, 683 (9th Cir. 2000); *United States v. Kiriki*, 756 F.2d 1449, 1453 (9th Cir. 1985); *United States v. Becker*, 720 F.2d 1033, 1035 (9th Cir. 1983).

"The rule is well established that the government in a conspiracy case may submit proof on the full scope of the conspiracy; it is not limited in its proof to the overt acts alleged in the indictment." *United States v. Rizk*, 660 F.3d 1125, 1131 (9th Cir. 2011); *accord United States v. Montgomery*, 384 F.3d 1050, 1061-62 (9th Cir. 2004) (acts that

occurred within the temporal scope of the conspiracy and were inextricably intertwined with the conspiracy are not subject to Rule 404(b) analysis).  Moreover, such inextricably intertwined acts are considered direct evidence of the offense.  *See United States v. Ramirez-Jiminez*, 967 F.2d 1321, 1327 (9th Cir. 1992).

Here, in particular, the government will offer evidence of conduct by Defendants Reyes Garcia and Contreras Ibarra that occurred in the Eastern District of Washington in 2015 and early 2016.  The evidence shows that the conspiracy spanned multiple jurisdictions, to include Eastern and Western Washington, and elsewhere.  As the evidence reveals, two of the co-defendants pending trial (and a third man identified as a target who was not ultimately charged) conspired with one another and others to engage in drug trafficking since at least since late 2015 and into early 2016, when they were identified in Western Washington committing the same criminal conduct together, then continued to engage in the same conspiratorial venture together until their arrests in November 2016.

As the Court ruled on August 24, 2017, this evidence is admissible as inextricably intertwined and therefore direct evidence of the offenses.[4]  *See United States v. Ramirez-Jiminez*, 967 F.2d 1321, 1327 (9th Cir. 1992) (inextricably intertwined evidence is "'direct evidence,' used to flesh out the circumstances surrounding the crime with which the defendant has been charged, thereby allowing the jury to make sense of the testimony in its proper context"); *United States v. Williams*, 989 F.2d 1061, 1070 (9th Cir. 1993) (testimony about uncharged drug transactions was admissible as proof of the charged drug conspiracy and provided necessary context for the witness' testimony about the alleged conspiracy conduct).

---

[4] See Transcript of August 24, 2017 Pre-Trial Hearing at pp 12-14.

U.S. Trial Brief - 17
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

**B.      Distribution of Controlled Substances.**

As set forth above, the Defendants are charged with multiple counts of distribution of controlled substances, based on controlled purchases made by CS1 and UC1[5].  The elements are (1) the defendant knowingly distributed methamphetamine, and (2) the defendant knew it was methamphetamine or some other prohibited drug.  *See* Ninth Circuit Model Jury Instruction No. 9.18.  The government will call CS1 and UC1 as witnesses, as well as law enforcement officers and cooperating witness(es).  The government also may introduce recordings for some of the buys, consensually recorded calls/texts setting up some of the deals, toll records, surveillance photographs, and of course the purchased controlled substances.

**C.      Possession with Intent to Distribute**.

Defendant Serrano is also charged with two counts of possession of controlled substances with intent to distribute, based on heroin found at his two residences on November 2 and 22, 2016.

To convict Defendant of this crime, the United States must prove beyond a reasonable doubt that: (1) Defendant knowingly possessed a controlled substance (here, heroin); and (2) he possessed it with the intent to deliver it to another person.  To "possess with intent to distribute" means to possess with intent to deliver or transfer possession of a controlled substance to another person, with or without any financial interest in the transaction.  *See* Ninth Circuit Model Jury Instruction 9.15.

**D.      Drug Quantity Proof.**

To trigger the increased penalty enhancements in Section 841(b)(1) corresponding to certain drug quantities, the government must prove beyond a reasonable doubt the amount of controlled substances involved in particular offenses.  *See Alleyne v. United*

---

[5] The government intends to dismiss Count 8, charging Serrano Carreno with distribution of methamphetamine on June 22, 2016.

U.S. Trial Brief - 18
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

1  *States,* 133 S. Ct. 2151, 2155 (2013)*; Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000);

2  *United States v. Velasco Heredia*, 319 F.3d 1080, 1086 (9th Cir. 2003) (stating that after

3  *Apprendi*, the statutory mandatory minimum sentences under 21 U.S.C. § 841 do not

4  apply "until the jury, or the court in a bench trial, finds beyond a reasonable doubt [ ] the

5  quantity involved in the violation.").

6        Conspiratorial liability for drug quantity differs somewhat from liability in a

7  substantive count.  A member of a conspiracy is responsible both for drug quantities

8  involved in his own activities or those activities he encouraged others to undertake as

9  with a substantive count, as well as for drug quantities involved in co-conspirators'

10  activities to the extent that such quantities were "reasonably foreseeable" to him.  *United*

11  *States v. Banuelos*, 322 F.3d 700, 705 (9th Cir. 2003).   In both contexts, the government

12  does not have to prove that the defendant knew the exact quantity of drugs.  *See* Ninth

13  Circuit Model Jury Instruction § 9.16 (2010 Edition).  Accordingly, the government will

14  provide the Court with special verdict questions for the jury to determine the quantities

15  involved in the different drug counts that allege a mandatory minimum sentence.

16  **E.**      **Felon in Possession of Ammunition.**

17        Defendant Serrano is also charged in Count 36 with being a felon in possession of

18  ammunition, in violation of 18 U.S.C. § 922(g)(1).  To convict Defendant of these

19  charges, the government must prove (1) that defendant possessed the ammunition in

20  question; (2) that the ammunition had been shipped or transported in interstate or foreign

21  commerce, and (3) that at the time the defendant possessed the ammunition, defendant

22  had been convicted of a crime punishable by imprisonment for a term exceeding one

23  year.  *Ninth Circuit Model Jury Instruction 8.65A*.

24        The government is prepared to prove that Serrano has multiple prior felony

25  convictions.  The United States has prepared several proposed stipulations for the

26  defendants' consideration, including regarding Serrano's felony status.  Serrano, through

27  counsel, has indicated that he is prepared to stipulate to a prior felony.

28  U.S. Trial Brief - 19
    *U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

The government is also prepared to prove, via the testimony of a specially trained ATF Special Agent, that the ammunition was in fact shipped or transported in interstate or foreign commerce if the defense is not prepared to so stipulate.  The government's burden on the interstate nexus element is very slight.  The government is required to prove only that the firearm traveled in interstate or foreign commerce at some point in time.  *Scarborough v. United States*, 431 U.S. 563, 575 n.11 (1977).  The shipment or transportation in interstate commerce need not be recent.  *United States v. Casterline*, 103 F.3d 76, 77 (9th Cir. 1996).  Testimony that a firearm is not manufactured in the state where the defendant possessed it is sufficient to meet the government's burden.  *United States v. Alvarez*, 972 F.2d 1000, 1002 (9th Cir. 1992).

The government need not establish that Defendant Serrano owned the ammunition, only that he possessed it.  *United States v. Casterline*, 103 F.3d 76, 78 (9th Cir. 1996). "The element of possession may be satisfied by proof of constructive or joint possession. To establish constructive possession, the government must produce evidence showing ownership, dominion, or control over the contraband itself or the premises or vehicle in which contraband is concealed." *United States v. Shirley*, 884 F.2d 1130, 1134 (9th Cir. 1989) (internal citations and quotation marks omitted).

## IV.    ANTICIPATED EVIDENTIARY ISSUES.

**A.    Body Wires and Intercepted Phone Calls and Texts.**

Some of the government's evidence will come in via consensually recordings and intercepted phone communications (e.g., wiretaps).  Some of the recordings are in English, some in Spanish, and some are a mixture of both languages.

The overwhelming majority of the intercepted calls and meetings are quite audible.  However, any complaints of inaudibility are addressed to the sound discretion of the Court.  *See United States v. Fuentes Montijo*, 68 F.3d 352 (9th Cir. 1995). Recordings that are partially unintelligible are admissible, unless those portions are so

substantial as to render the recordings as a whole untrustworthy. *United States v. Llinas*, 603 F.2d 506 (5th Cir. 1979); *United States v. Tisor*, 96 F.3d 370, 376 (9th Cir. 1996).

The government has prepared transcripts of all of the recorded calls it intends to use at trial. Drafts of the transcripts have been provided to defense counsel, and the final versions will be provided in the government's exhibit notebooks. Complaints or objections regarding the accuracy of transcripts go to weight not admissibility.

### 1.      English Language Recordings and Texts.

As to the English language recordings, the Ninth Circuit approves the use of transcripts of properly admitted recordings to aid the jury in understanding the recordings. *United States v. Rinn*, 586 F.2d 113 (9th Cir. 1978); *United States v. Taghipour*, 964 F.2d 908 (9th Cir. 1992); *United States v. Pena Espinoza*, 47 F.3d 356 (9th Cir. 1995); *United States v. Armijo*, 5 F.3d 1229 (9th Cir. 1993). The Ninth Circuit also has approved of the use of transcripts during deliberations, under certain circumstances. *United States v. Turner*, 528 F.2d 143, 168 (9th Cir. 1975); *United States v. Fuentes Montijo*, 68 F.3d 352, 353 55 (9th Cir. 1995).

As to the English language recordings, the jury should be instructed that the recordings themselves are the evidence, and the transcripts are only a guide. *United States v. Turner*, 528 F.2d 143, 167 68 (9th Cir. 1975). The standard rule for resolving disputes between an audiotape and a transcript is for the jury to refer to the tape as evidence and not the transcript.

### 2.      Spanish Language Calls and Texts.

The law is reversed on the Spanish language recordings. When recordings are in a foreign language, the written English translations are admissible into evidence, rather than the recordings. *United States v. Rrapi*, 175 F.3d 742, 746 (9th Cir.1999); *United States v. Fuentes  Montijo*, 68 F.3d at 355 56. In such circumstances, the translations substitute for the actual recordings. *Id.* The government has retained an experienced

U.S. Trial Brief - 21
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Spanish linguist to prepare the translations, and she has been disclosed as an expert to the defense.

### 3. Proposed Method of Introducing Recordings.

As to the recordings made by a CS or UC1, the government intends to introduce the recordings through the case agent who handled the CS, through the CS himself, and UC1, who were participants in the recorded conversations and have first-hand knowledge of their contents. The calls themselves are admissible as statements in furtherance of the conspiracy (as to others captured during the recordings).

For the wiretap calls, which are a mix of English and Spanish, (and sometimes both in the same recording) the government intends to introduce them through the case agent, DEA Special Agent Benjamin Gerrol, who worked in the wire room and is familiar with how the interceptions were made. As to the calls that are exclusively or mostly in the English language, the government proposes to play the recording, and then have the jury follow along with the transcript. As to the calls that are exclusively or mostly Spanish, the defense has indicated they will not stipulate to the accuracy of the translations; accordingly, the government will also call the interpreter who prepared the translations to testify as to their preparation. For these calls, the government intends to read the English translations of the Spanish language calls to the jury, while the jurors follow along in the transcripts, in lieu of playing the actual audio recordings themselves. With the Court's permission, the government will have the agents or law students read the transcripts into the record. The government is aware that this procedure has been employed in several trials in this District, which have involved wiretap conversations in foreign languages.

### 4. Voice Attribution.

The government prepared transcripts that indicate who the speakers are in the recorded conversations. The government's voice attribution evidence will consist of one or more of the following: (1) testimony of cooperating witnesses who were parties to the

U.S. Trial Brief - 22
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

1  calls and who can identify the other person on the call from personal knowledge; (2)

2  investigator observations that substantiate who was the user of a particular telephone

3  number (e.g., GPS and/or toll data for a phone, agents observed an individual using the

4  phone, the phone was later seized and/or searched); and (3) testimony from agents or

5  cooperating witnesses familiar with the voices on the recordings.

6  **B.   Admissibility of Defendant's Own Statements.**

7        The United States also intends to introduce various statements made by these

8  defendants.  These statements include statements made to the confidential sources or to

9  others in the vicinity of the confidential sources, during the wiretap, and to testifying co-

10 conspirators.  The government also intends to offer post-*Miranda* statements made by

11 defendant Serrano at the time of his two arrests.  Statements by a defendant are not

12 hearsay when offered by the government against the speaker.  Fed. R. Evid. 801(d)(2).

13       However, the converse is not true.  An out-of-court statement of a declarant

14 offered by the declarant on his own behalf (or by a co-defendant) is inadmissible hearsay

15 because, among other things, it is not a statement by a party-opponent.  *See United States*

16 *v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000); *see also Williamson v. United States*, 512

17 U.S. 594, 600 (1994) (the hearsay rule excludes self-exculpatory statements because such

18 statements "are exactly the ones which people are most likely to make even when they

19 are false").

20       As to Serrano, the evidence will show that during a post-*Miranda* interview on

21 November 2, 2016, he admitted to picking up drugs from Marquez and Garcia Gutierrez

22 several months ago, but claimed that he was no longer selling drugs because it was not

23 paying out like it did before.  During a post-*Miranda* statement on November 22, 2016,

24 Serrano stated that he used to sell heroin in the summer to the individual who had come

25 to his house on November 18, 2016, and that he used to have connections but that he

26 (Serrano) stopped selling drugs months ago.  The defense has not moved to suppress

27 either of these statements, and there has been no allegation that he did not understand his

28 U.S. Trial Brief - 23
   *U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

1  rights, or that his statements were involuntary. Accordingly, those admissions are
2  admissible.

3  **C.      Admissibility of Co-Conspirator Statements.**

4        The government will also seek to introduce other recorded calls intercepted during
5  the wiretap. These communications are admissible as co-conspirator statements in
6  furtherance of the conspiracy pursuant to FRE 801(d)(2)(E). In addition, statements
7  made by one co-conspirator to another are also admissible.

8        Under Evidence Rule 801(d)(2)(E), a statement made by a co-conspirator is
9  admissible if the government establishes by a preponderance of the evidence:  1) the
10 existence of a conspiracy; 2) the defendant's connection to it, and 3) that the statement
11 was made during and in furtherance of the conspiracy. *Bourjaily v. United States*, 483
12 U.S. 171, 175 (1987); *United States v. Fleishman*, 684 F.2d 1329, 1337 (9th Cir. 1982).
13 The statements themselves may help establish their admissibility and reliability under
14 801(d)(2)(E). *See Bourjaily*, 483 U.S. at 175; *see also United States v. Schmit*, 881 F.2d
15 608 (9th Cir. 1989).

16       There must be some evidence, aside from the proffered statements, of the
17 existence of the conspiracy and the defendant's involvement. *United States v. Gordon*,
18 844 F.2d 1397, 1402 (9th Cir. 1988). Circumstantial evidence is sufficient. *See e.g.,*
19 *United States v. Mason*, 658 F.2d 1263, 1269 (evidence that defendant visited
20 coconspirator's residence just prior to time coconspirator advised he had drugs was
21 sufficient to connect defendant to the conspiracy).

22       To satisfy the "furtherance" requirement, the statement must be said to "'further
23 the common objectives of the conspiracy,' or, 'set in motion transactions that [are] an
24 integral part of the [conspiracy].'" U*nited States v. Layton*, 720 F.2d 548, 555 (9th Cir.
25 1983). Examples of "in furtherance" include statements that keep a conspirator abreast,
26 *United States v. Andersson*, 813 F.2d 1450, 1456 (9th Cir. 1987); induce continued
27 participation, *United States v. Eaglin*, 571 F.2d 1069, 1083 (9th Cir. 1977); allay fears,

28 U.S. Trial Brief - 24
   *U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

1   *United States v. Layton*, 720 F.2d 548, 557 (9th Cir. 1983); explain co-conspirators'

2   roles, *United States v. Moody*, 778 F.2d 1380, 1382-83 (9th Cir. 1985), *amended by* 791

3   F.2d 707 (9th Cir. 1986); or aim to avoid detection, *United States v. Sears*, 663 F.2d 896,

4   905 (9th Cir. 1981).  The focus is on the declarant's intent in making the statement, not

5   on its actual effect of promoting the goals of the conspiracy.  *United States v. Zavala*

6   *Serra*, 853 F.2d at 1516; *United States v. Layton*, 720 F.2d 548, 557 n.5 (9th Cir. 1983).

7          Additionally, it is not necessary that the statement be made to another member of

8   the conspiracy for it to come under Rule 801(d)(2)(E).  *See Zavala Serra*, 853 F.2d at

9   1516 (statements to government informant); *United States v. Taylor*, 802 F.2d 1108, 1117

10  (9th Cir. 1986) (statements to undercover FBI agent); *United States v. Echeverry*, 759

11  F.2d 1451, 1457 (9th Cir. 1985) (statements to undercover DEA agent);  *United States v.*

12  *Smith*, 623 F.2d 627, 631 (9th Cir. 1980) (statement to informant).

13         The order of proof is left to the discretion of the Court such that a co-conspirator's

14  statements may be admitted subject to being struck for failure of independent proof of the

15  existence of the conspiracy and the defendant's connection to it.  *United States v. Perez*,

16  658 F.2d 654, 658 59 (9th Cir. 1981).

17         Here, the government anticipates seeking to admit conversations between the

18  confidential source(s)/UC1 and defendants, and between the confidential sources/UC1

19  and other members of the conspiracy, to include persons who have entered guilty pleas,

20  as well as between members of the charged conspiracy.  Virtually all involve, as one or

21  both parties to the call or text, defendants who have, in fact, plead guilty to that same

22  conspiracy.  There can be no good faith argument that they are not (at least for purposes

23  of deciding the threshold question of admissibility) calls/conversations between

24  conspirators, or that they were not in furtherance of the conspiracy.

25         Finally, the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36, 56

26  (2004), has no effect on the admissibility of statements by co-conspirators in furtherance

27  of a conspiracy.  Specifically, the Supreme Court found that the statements of co-

28  U.S. Trial Brief - 25
    *U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

1   conspirators are not made in with the expectation that they will be used at trial, and

2   therefore there is no Sixth Amendment violation by an inability of the defendant to cross

3   examine the co-conspirators who made the statements.  *Id.  See also United States v.*

4   *Larson*, 460 F.3d 1200. 1213 (9th Cir. 2006) (Ninth Circuit recognizing that the

5   admission of co-conspirator statements do not violate the Sixth Amendment).

6   **D.     Other Out-of-Court Statements Offered for Non-Hearsay Purposes.**

7        "Hearsay is a statement, other than one made by the declarant while testifying at

8   the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R.

9   Evid. 801(c).  The admission of hearsay into evidence is generally proscribed by Rule

10   802.  When it is relevant that an out of court statement was made, however, and the

11   statement is offered exclusively to prove that it was made, it is not hearsay and is

12   therefore admissible.  *See Williams v. United States*, 458 U.S. 279 (1982).  That is

13   because statements not offered for their truth are not hearsay.  Fed. R. Evid. 801(c).

14        In certain instances, the government may offer out-of-court statements not to

15   prove the truth of the matters asserted, but merely to explain information possessed by,

16   and the subsequent actions of, the investigative agents, law enforcement officers, and

17   other witnesses.  Furthermore, additional out-of-court statements provide necessary

18   context in order to comprehend the admissible statements of Defendant and his co-

19   conspirators.  Because these statements will not be offered for the truth of the matter

20   asserted, the statements would not constitute hearsay as defined by Rule 801(c).  *See*

21   *United States v. Mitchell*, 502 F.3d 931, 969 (9th Cir. 2007) (no error in allowing

22   investigator testify about out-of-court statements from an informant that caused him to go

23   to a certain location); *United States v. Munoz*, 233 F.3d 1117, 1134 (9th Cir. 2000) (no

24   error in allowing attorney to testify about out-of-court conversations with Michigan State

25   investigators that caused him to send letter requesting that investment company sales

26   personnel suspend investment sales); *United States v. Brown*, 923 F.2d 109, 111 (8th Cir.

27

28   U.S. Trial Brief - 26
     *U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

1  1991) (out-of-court statement is not hearsay if offered for the limited purpose of

2  explaining why a police investigation was undertaken).

3  **E.    Business and Governmental Records.**

4       The government intends to offer into evidence business records from various

5  sources (primarily phone toll and subscriber information, as well as hotel records).  The

6  business record exception allows a record to be admitted if it is made at or near the time

7  of the events set forth therein, by a person with knowledge, and is kept in the course of

8  regularly conducted business activity, if it is the regular practice of the business to make

9  the record.  Fed. R. Evid. 803(6).  Any person familiar with the business record keeping

10  practices of the business who can identify the record at issue as having been made in the

11  ordinary course of business is a sufficient foundational witness.  Personal knowledge of

12  the document is not required, and does not affect its admissibility.  *United States v.*

13  *Pitman*, 475 F.2d 1335, 1337 (9th Cir. 1973); *see United States v. Childs*, 5 F.3d 1328,

14  1334 (9th Cir. 1993) (the phrase "other qualified witness" is broadly interpreted to

15  require "only that the witness understand the record-keeping system" at the particular

16  business).  Similarly, a record generated by a third party and received and relied upon in

17  the ordinary course, such as an invoice, becomes a business record of the company

18  relying upon it.  *Id*. at 1333-34; *see United States v. Jawara*, 474 F.3d 565, 585 (9th Cir.

19  2007) ("[W]e would have no trouble concluding that a college in the United States was a

20  proper custodian of its students' SAT results, even though the SAT results were actually

21  prepared by another entity").  Incompleteness, ambiguities, and inaccuracies in records

22  go to the weight to be given the evidence, not to its admissibility.  *United States v.*

23  *Catabran*, 836 F.2d 453, 458 (9th Cir. 1988).

24       Here, copies of the records and custodian certifications have been provided

25  through discovery.  No objection having been received, the records are admissible under

26  902(11) of the Federal Rules of Evidence.

27

28  U.S. Trial Brief - 27
   *U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

**F.      Physical Evidence Seized.**

The United States will introduce at trial physical evidence seized over the course of the investigation, including, but not limited to, evidence seized during traffic stops and from the various search warrants executed during this investigation.  The government will be calling searching and seizing officers to authenticate these items, along with others who observed these items during the execution of the various search warrants.  In some instances, the government will introduce photographs of the physical items in lieu of the items themselves.  The government will call agents who will testify that the photographs are true and accurate depictions of the condition of the items at the time they were seized.

**G.      Recalling Law Enforcement Witnesses and Interrupting Witnesses**.

The government requests leave of Court to re-call several law enforcement witnesses during the course of the trial.  First, the government may call the case agents (DEA Special Agents Benjamin Gerrol and Joseph Cheng) to the stand on multiple occasions to introduce wiretap recordings, surveillance, and other topics.  In addition, the government requests permission to re-call certain law enforcement officers who participated in multiple days of surveillance and/or in searches of various locations.  This procedure will allow for the orderly and chronological presentation of evidence to the jury.  Requiring each agent to testify once regarding all of the days he/she participated in the investigation would be extremely confusing for the jury.  The government will, of course, attempt to limit the extent to which it is necessary to recall witnesses.  In any event, we do not foresee any potential for prejudice to the defendants through this procedure.  Further, the government may need to interrupt the testimony of a witness in order for another witness to testify.  Several of the government's witnesses are travelling from out of state and will need to testify at certain times in order to meet travel requirements.  Again, the government will seek to minimize interruptions in testimony to the extent possible.

U.S. Trial Brief - 28
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**H.    Admissibility of Evidence Regarding Dominion and Control**

The government expects to offer certain documents seized from the residences searched in this matter where narcotics and/or weapons were found.  These documents are directly relevant to dominion and control of certain locations in the residences and of the residences themselves.  The documents include passports and registration documents that reflect Defendants' Mexican citizenship.  It should be noted that the fact of Mexican citizenship does not implicate a lack of United States citizenship nor a lack of legal status to be present in the United States.  As set forth in the government's response to Defendant Baltazar Reyes Garcia's Motions in Limine, the government does not intend to elicit testimony with regard to immigration status in its case in chief unless the defense opens the door to such topics through questioning or argument, Dkt. #455 at p. 3.

**I.    Admissibility of Photographs and Diagrams.**

The government expects to offer photographs of the various locations associated with the various drug transactions and/or searches, as well maps and diagrams (not necessarily to scale) of the locations.  The photos and diagrams are admissible.  *See United States v. Brannon*, 616 F.2d 413, 416 (9th Cir. 1980) (evidence that photographs accurately depict scene provides a sufficient foundation for admission under FRE 901(a)).

**J.    Admissibility of Summary Charts.**

The investigation and prosecution of this case has involved extensive review of voluminous telephone and GPS records.  It also involved the seizure and analysis of numerous drug exhibits.  Accordingly, the government may present evidence through Case Agents Benjamin Gerrol and Joseph Cheng in the form of summary testimony and charts.  The government has provided the defense with all the underlying materials, and will provide drafts of each of these summary charts.

U.S. Trial Brief - 29
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Federal Rule of Evidence 1006 states that: "[t]he proponent may use a summary,

2  chart, or calculation to prove the content of voluminous writings, recordings, or

3  photographs that cannot conveniently be examined in court."  The proponent of a

4  summary under Rule 1006 must establish that the underlying materials cannot be

5  conveniently examined in court, and that they are admissible at trial, as conditions

6  precedent to introduction of the summary into evidence.  *Amarelu v. Connell*, 102 F.3d

7  1494, 1516 (9th Cir. 1997); *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir.

8  1988); United States v. Johnson, 594 F.2d 1253, 1257 (9th Cir. 1979).  The proponent of

9  a summary also must establish that the underlying documents were made available to the

10 opposing party for inspection.  *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1259

11 (9th Cir. 1984).  Summaries must fairly represent the underlying documents, and their

12 admission into evidence is left to the trial court's discretion.  *Davis & Cox v. Summa

13 Corp.*, 751 F.2d 1507, 1516 (9th Cir. 1985), superseded on other grounds by *Northrup

14 Corp. v. Triad Intern. Mktg., SA*, 842 F.2d 1154 (9th Cir. 1988).

15 All of these requirements are met in this case.  If the government were to publish

16 all of the relevant telephone records and GPS reports, the jury would be faced with

17 reviewing thousands of pages of documentsThe government has provided the defense

18 with copies of all of the underlying records.  The summary testimony and charts are

19 accurate and non-prejudicial.

20 Rule 1006 does not require that it literally be impossible for the fact finder to

21 examine the underlying records before a summary may be admitted.  *United States v.

22 Stephens*, 779 F.2d 232, 238-39 (5th Cir. 1985); *United States v. Scales*, 594 F.2d 558,

23 562 (6th Cir. 1979).  Rule 1006 contemplates that summaries of voluminous records may

24 be used without introducing each and every underlying document into evidence.  *Scales*,

25 594 F.2d at 562.  Furthermore, the fact that some of the underlying documents are already

26 in evidence does not mean that they can be "conveniently examined in court."  *United

27

28 U.S. Trial Brief - 30
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

1   *States v. Stephens*, 779 F.2d at 239; *United States v. Lemire*, 720 F.2d 1327, 1347 (D.C.

2   Cir. 1983).

3          The Ninth Circuit has affirmed the admission as substantive evidence of a wide

4   variety of summary charts pursuant to Rule 1006 where (as in this case) such charts are

5   based on the sponsoring witnesses' out-of-court review of voluminous evidence.  *See,*

6   *e.g., United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989) (DEA agent presented

7   chart summarizing information about telephone calls made to and from phones associated

8   with defendants, relying on review of phone records, rental records, jail records, and

9   other information); *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988) (chart

10  summarizing phone records and law enforcement surveillance reports); *United States v.*

11  *Catabran*, 836 F.2d 453, 456-458 (9th Cir. 1988) (charts summarizing voluminous

12  computer printouts and inventory records in bankruptcy fraud prosecution); *United States*

13  *v. Gardner*, 611 F.2d 770, 776 (9th Cir. 1980) (IRS agent presented chart summarizing

14  assets, liabilities, and expenditures of defendant in tax prosecution).

15         Under the cited authority, the government respectfully requests that these

16  summaries and charts be ruled substantively admissible.

17  **K.     Expert Witnesses.**

18         The United States is prepared to call several experts, and has provided notice to

19  the defense of their identity and the subject matter of their testimony.  Under Federal

20  Rule of Evidence 702, "[i]f scientific, technical, or other specialized knowledge will

21  assist the trier of fact to understand the evidence or to determine a fact in issue, a witness

22  qualified as an expert by knowledge, skill, experience, training, or education, may testify

23  thereto."  Expert testimony must be both (1) relevant, that is, it must have a valid

24  connection to the pertinent inquiry at trial, and (2) reliable, that is, it must be trustworthy.

25  Each of the government's proposed expert witnesses are experts in their respective

26  chosen fields, and the government submits that their testimony will meet the reliability

27  requirements set forth in Daubert.

28  U.S. Trial Brief - 31
    *U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

The United States intends to call the Spanish interpreter to testify as to her work translating and preparing the call transcripts and text messages the government intends to introduce at trial.

The United States also intends to call specially trained fingerprint examiners, Ashley Leon and Michael Hall to discuss their analysis and findings.

As noted above, the government is prepared to call ATF Special Agent David Roberts to testify as to the interstate "nexus" of the ammunition involved in the felon in possession counts.

The United States may call a DEA Forensic Chemist to testify generally about the science, technology and procedures for drug analysis.

Lastly, the government is prepared to call DEA Special Agent Errin Jewell to testify as an expert on drug trafficking subjects.  Special Agent Jewell has testified as experts in other federal criminal trials.

"Courts have overwhelmingly found police officers' expert testimony admissible where it will aid the jury's understanding of an area, such as drug dealing, not within the experience of the average juror."  *United States v. Thomas*, 74 F.3d 676, 682 (6th Cir. 1996).  The Ninth Circuit has explained the basis for such expert testimony as follows:

> We have held that drug-enforcement experts may testify that a defendant's activities were consistent with a common criminal modus operandi.  This testimony helps the jury to understand complex criminal activities, and alerts it to the possibility that combinations of seemingly innocuous events may indicate criminal behavior.  Further we even allow modus operandi expert testimony in cases that are not "complex."

*United States v. Webb*, 115 F.3d 711, 713-14 (9th Cir. 1997) (*citing United States v. Johnson*, 735 F.2d 1200, 1202 (9th Cir. 1984) ("[G]overnment agents or similar persons may testify as to the general practices of criminals to establish the defendants' modus operandi."); *United States v. Gill*, 58 F.3d 1414, 1422 (9th Cir. 1995) (rejecting

U.S. Trial Brief - 32
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

contention that modus operandi testimony was improper because the activities described were not "complex ones requiring expert explanation").

These witnesses will testify, based on their experiences, that the amount of drugs involved in the conspiracy, and also possessed by defendants, are consistent with a trafficking offense (as opposed to mere possession for personal use), based on all of the facts and circumstances.  They will provide other background information, including the following:

1.      The wholesale and street value of the drugs seized during the investigation. It is well established that drug agents and officers are permitted to testify concerning the value of narcotics.  *United States v. Campos*, 217 F.3d 707, 718 19 (9th Cir. 2000); *United States v. Golden*, 532 F.2d 1244 (9th Cir. 1976).   Among other things, such testimony is highly relevant to the intent to distribute.

2.      The process by which drugs are prepared for distribution, including the "cutting," weighing and packaging of drugs, and methods for transporting drugs.

3.      Drug trafficking organizations, their methods of operation, and common paraphernalia and indicia of trafficking activity.

4.      Drug terminology for various kinds of drugs, such as cocaine, heroin and methamphetamine, including but not limited to the slang terms for different quantities of drugs.  *See, United States v. Plunk*, 153 F.3d 1011, 1017 (9th Cir. 1998), *overruled on other grounds, United States v. Hankey*, 203 F.3d 1160, 1169, n.7 (9th Cir. 2000) (holding that "the jargon of the narcotics trade and the codes that drug dealers often use . . . [are] proper subjects of expert opinion," and ruling that District Court properly qualified detective with extensive experience in narcotics investigations as an expert on that subject).

In addition, the government anticipates eliciting some of this same information through the testimony of cooperating defendants.  While the government will not seek to introduce "expert" testimony through these witnesses as such, the cooperating defendants

U.S. Trial Brief - 33
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   have personal knowledge on many of these same topics.  They know, from personally

2   knowledge, the slang/codes used by their co-conspirators, where the drugs came from,

3   what a dealer versus use quantity is for these substances, how the drugs are cut and

4   prepared and the prices charged for various quantities of these controlled substances.

5   **L.      Admission of a Cooperating Defendant's Guilty Plea.**

6          The admissibility of a co-defendant's guilty plea depends upon the purpose for

7   which it is offered.  *United States v. Smith*, 790 F.2d 789, 793 (9th Cir. 1986).  Evidence

8   of a testifying co-defendant's guilty plea may be elicited on the issue of the witness's

9   credibility, *United States v. Halbert*, 640 F.2d 1000, 1004 (9th Cir. 1981) (per curiam), or

10  "to support the reasonableness of the witness' claim to firsthand knowledge because of

11  admitted participation in the very conduct which is relevant," *United States v. Rewald*,

12  889 F.2d 836, 865 (9th Cir. 1989).  A co-defendant's guilty plea may not be offered as

13  substantive evidence of the defendant's guilt, and the government will not do so in this

14  case.  However, a co-defendant's guilty plea, and in particular its detailed terms also

15  should not be used to suggest to the jury these defendant's own potential penalty if he

16  should be convicted.  "It has long been the law that it is inappropriate for a jury to

17  consider or be informed of the consequences of their verdict."  *United States v. Frank*,

18  956 F.2d 872, 879 (9th Cir. 1992); *see also Rogers v. United States*, 422 U.S. 35, 40

19  (1975) (jury should have been admonished that it "had no sentencing function and should

20  reach its verdict without regard to what sentence might be imposed"); *United States v.*

21  *Reed*, 726 F.2d 570, 579 (9th Cir. 1984) (trial judge properly instructed jury that the

22  "punishment provided by law for the offenses charged in the indictment are matters

23  exclusively within the province of the court.  It should never be considered by the jury in

24  any way in arriving at an impartial verdict as to the guilt or innocence of the accused").

25  Information about penalties draws the attention of the jury away from its chief function as

26  the trier-of-fact, opens the door to compromise verdicts, and confuses the issues to be

27  decided.  *United States v. Olano*, 62 F.3d 1180, 1202 (9th Cir. 1995).

28  U.S. Trial Brief - 34
    *U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

1

## V.    CONCLUSION.

2

3    The United States is not aware of other legal issues that are likely to arise during

4    the course of this trial.  If other issues do arise, the government requests the opportunity

5    to address those issues by way of a supplemental brief or briefs.

6        DATED: this 18th day of September, 2017.

7

8                                    ANNETTE L. HAYES
                                     United States Attorney

9

10                                   */s/ S. Kate Vaughan*
                                     STEVEN T. MASADA

11                                   S. KATE VAUGHAN
                                     Assistant United States Attorneys

12                                   700 Stewart Street, Suite 5220
                                     Seattle, Washington  98101

13                                   Phone: 206-553-7970
                                     E-mail: kate.vaughan@usdoj.gov

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on September 18, 2017, I electronically filed the foregoing

3  with the Clerk of the Court using the CM/ECF system which will send notification of

4  such filing to the attorney(s) of record for the defendant(s).

5

6                              *s/ Alissa Harris*
                              ALISSA HARRIS
7                              Paralegal Specialist
8                              United States Attorney's Office
                              700 Stewart Street, Suite 5220
9                              Seattle, Washington 98101-1271
                              Phone: (206) 553-4439
10                             Fax: (206) 553-4440
                              Email: alissa.harris@usdoj.gov
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

U.S. Trial Brief - 36
*U.S. v. Reyes Garcia, et al.*, CR16-287 JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970